UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BADGER DAYLIGHTING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-02106-SEB-MJD |
| | ) | |
| GARY PALMER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| GARY PALMER, | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BADGER DAYLIGHTING CORP., | ) | |
| | ) | |
| Counter Defendant. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiff Badger Daylighting Corporation's

("Badger") Motion for Preliminary Injunction [Dkt. 22] filed on June 3, 2019. With that

motion, Badger seeks an order enjoining Defendant Gary Palmer from using Badger's

confidential information and trade secrets; soliciting Badger's customers and employees;

continuing his employment with SEC and HydroX; destroying, altering, removing,

modifying, deleting, or disposing of any documents; and otherwise unfairly competing

with Badger [Dkt. 22, Dkt. 68]. This matter came before the Court for oral argument on

September 6, 2019.

1

For the reasons detailed in this entry, Plaintiff's motion is GRANTED in part and DENIED in part.

## Factual Background

### I. The Parties

Badger is a Canadian corporation with its principal place of business in Alberta, Canada [Dkt. 1-2, at 2; Dkt. 63, at 1]. Badger purports to be the industry leader in non-destructive hydro-excavation ("hydrovac") services [Dkt 1-2, at 1]. Its workforce numbers approximately 2300 employees and it conducts operations in 42 states and Canada [Dkt 1-2, at 1; Dkt 63, at 1]. Mr. Palmer is a United States citizen residing in Henry County, Georgia [*Id.*]. Mr. Palmer was employed with Badger for nearly seven years from July 26, 2012 through April 8, 2019 [Dkt. 63, at 1-2; Dkt. 68, at 3-4, 8]. He served as a Regional Manager from December 20, 2013 until his resignation, when he began employment with Southeast Connections, LLC ("SEC") as President of SEC's hydrovac services business line [*Id.*].

SEC, a subsidiary of PowerTeams Services ("PowerTeams"), is a general contractor that performs utility infrastructure services, including hydrovac services, in many of the same locations as Badger [Dkt. 63, 2-3; at Dkt. 68, at 9]. Shortly after Mr. Palmer began his employment with SEC, SEC spun off its hydrovac business line into a new entity, Hydro Excavators, LLC ("HydroX"), which Mr. Palmer now oversees [*Id.*]. Neither SEC nor any of its related entities is a party to this litigation.

## II.     Mr. Palmer's Employment with Badger

Mr. Palmer was first hired by Badger as a Field Supervisor in July 2012 [Dkt. 68, at 3]. Prior to this employment, he had never heard of hydrovacing [*Id.*]. Mr. Palmer quickly rose up the ranks at Badger, receiving three promotions in less than a year and a half [*Id.* at 3-4; Dkt. 63, at 1]. On December 20, 2013, Mr. Palmer was promoted to Regional Manager for the Southeast Region, whose duties included: managing and growing significant customer accounts; identifying opportunities for his sales team; maximizing his team's performance on sales targets; teaching Area Managers how to identify opportunities and grow the business; developing and executing sales strategies; and forecasting, managing, and reporting sales activity [[Dkt. 68, at 4-5]. He also had management and recruitment responsibilities [*Id.*]. In his roles at Badger, particularly as Regional Manager, Mr. Palmer had extensive access to Badger's confidential business data and information, which generally was provided to employees only on a need-to-know basis [*Id.* at 6].

Upon promotion to the Regional Manager position, Mr. Palmer signed the non-compete, non-solicitation, and confidentiality agreement currently in dispute before the Court (the "Agreement") [*Id.* at 5; Dkt. 63, at 4]. The confidentiality provision of the Agreement prohibits the disclosure and use of confidential information and defines "confidential information" as:

> Information which has been created, discovered, developed by or otherwise become known to [Badger] . . . which information has commercial value to [Badger], including but not limited to trade secrets, innovations, equipment designs, processes, computer codes, data, know how, improvements, discoveries, development, techniques, marketing plans, strategies, costs, customers, and client lists, or any

information the Employee has reason to know [Badger] would like to treat as confidential for any purpose, such as maintaining a competitive advantage or avoiding undesired publicity, whether or not developed by the Employee.

The confidentiality provision further provides:

> Unless previously authorized . . . [u]pon termination of employment, the Employee shall return to [Badger] any and all property and records of [Badger] in his possession, at [Badger], at his personal residence or elsewhere . . .

The non-compete and non-solicitation provisions of the Agreement prohibit Mr. Palmer from:

(a) Solicit[ing], accept[ing] or divert[ing] business from any customer of [Badger] or attempt[ing] to convert any such customer to acquire services from another person or entity which are similar to the services provided by [Badger] . . . the term "customer" shall mean any person or entity to whom [Badger] has provided services during the preceding twelve months to the start of the Period, or any such persons or entities known by Employee to have been targeted or contacted by [Badger] for sale of such services during such twelve months;

(b) Within . . . Georgia, Florida, Tennessee, North Carolina, South Carolina, Alabama, Virginia, Mississippi, compete in any manner with [Badger], or own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any business which competes directly or indirectly with [Badger]; and

(c) Solicit[ing] for employment any employee, consultant, contractor or sub-contractor of [Badger].

[Dkt. 57-1, Exh. 18].

### III.    Mr. Palmer's Departure from Badger and Employment with SEC/HydroX

In approximately February or March of 2019, Mr. Palmer spoke with a former

Badger employee and current SEC employee about opportunities at SEC [*Id.* at 8]. Mr.

Palmer was directed to Billy Campbell, SEC's co-founder and former president. Mr.

Campbell informed Mr. Palmer that SEC was spinning off its hydrovac business into a

new entity, HydroX, and that he was looking for someone with experience to run this business line [*Id.*]. SEC extended an offer to Mr. Palmer on March 1, 2019, which Mr. Palmer accepted on April 1, 2019 [*Id.*; Dkt. 63, at 2]. The same day he accepted employment with SEC, Mr. Palmer informed his direct supervisor at Badger that he was resigning but would not state where he was going to work [Dkt. 68, at 7]. Mr. Palmer was reminded of his obligations pursuant to the Agreement [*Id.*].

## IV. Badger's Asserted Grounds for Relief

Badger's request for injunctive relief addresses five legal claims: breach of the Agreement's confidentiality provision; breach of a fiduciary duty; violation of the Indiana Uniform Trade Secrets Act ("IUTSA"); breach of the agreement's non-solicitation provision; and breach of the Agreement's non-compete provision [*See generally* Dkt. 68]. The parties have provided additional facts specific to each claim.

### A. Breach of the Agreement's Confidentiality Provision & Violation of the IUTSA

Both Badger's breach of contract claim pursuant to the confidentiality provision and its IUTSA claim arise from Mr. Palmer's alleged absconding with over 5000 Badger documents on the eve of his resignation [Dkt. 68, at 13]. Specifically, the day before announcing his resignation from Badger, March 31, 2019, at approximately 5:00 a.m., Mr. Palmer downloaded more than 5000 documents from his Badger computer onto a Seagate large capacity external hard drive [*Id.* at 13-14]. The downloaded documents included: budgets; emergency response plans; employee contact information; customer contact information; contract pricing and bid information for specific customers; strategic

plans; organizational charts; job descriptions; regional compensation planning information; financial reports and statements; employee training materials; business development planning materials and goals; master servant agreements and compiled lists of master servant agreements; equipment drawings; and employee salary information [*Id.* at 14; Dkt. 59-3, Exh. 103].

Mr. Palmer retained possession of the hard drive onto which he had downloaded the Badger documents and did not disclose its existence, despite specific discovery-based interrogatories aimed at eliciting such information [Dkt. 68, at 14]. After conducting its own forensic investigation of Mr. Palmer's assigned Badger computer, Badger discovered all that Mr. Palmer had taken from its files without permission [*Id*]. On June 20, 2019 Badger promptly informed opposing counsel of Mr. Palmer's unauthorized heist and the existence of the hard drive [*Id.*]. During the Court hearing, counsel for Mr. Palmer attempted to explain Mr. Palmer's prior failure to reveal the existence of the hard drive as having merely "slipped his mind." Our assessment of those circumstances is not so benign.

Mr. Palmer's own expert confirmed the following detailed information about Mr. Palmer's use of the hard drive: Mr. Palmer had attached the hard drive to his personal computer and accessed the documents following his departure from Badger. He took these steps as recently as June 20, 2019, the date when his counsel was informed by Badger of the hard drive's existence [*Id.*; Dkt. 59-3, Exh. 104]  Mr. Palmer's expert also confirmed that two documents were located on both the hard drive and Mr. Palmer's

SEC/HydroX computer, including a file entitled "2018 Emergency Response File/Emergency response plan" (the "Emergency Response Plan") [*Id.*].

The Emergency Response Plan had been developed by a Badger committee, which had included Mr. Palmer, to help its customers respond to natural disasters. The file was discovered attached to a May 22, 2019 e-mail sent by Mr. Palmer from his HydroX e-mail address to his Hydro-X executive assistant [*Id.* at 14], whom Mr. Palmer directed to review the document "to ensure the B word isn't utilized" [*Id.* at 14]. Mr. Palmer then sent an email to Mr. Campbell with an attachment entitled "Hydro X Emergency Response Plan" [*Id.* at 14-15]. The HydroX Emergency Response Plan was virtually identical to the Badger Emergency Response Plan, except for the removal of the Badger name [*Id.* at 15]. Again, during the Court's hearing on the pending motions, counsel for Mr. Palmer stated that the document has now been completely "pulled back" and is not being used at or by HydroX.

After these discoveries, Mr. Palmer turned over the hard drive as well as his personal computer to Badger for inspection [Dkt. 64, at 22]. However, per his deposition testimony, Mr. Palmer has represented that he cannot recall what action he took with the hard drive between the time he originally created it and the time Badger notified defense counsel of its existence, nor can he recall whether he ever connected the hard drive to any other device, including any device at SEC/HydroX [Dkt. 59-3, Exh. 105]. He also cannot state with certainty whether he sent the Badger documents to anyone in particular or saved them in another location [*Id.*].

## B.  Breach of the Non-Compete Provision

Badger asserts that Mr. Palmer's employment with SEC/HydroX constitutes a breach of his non-compete agreement. Whether or to what extent SEC/HydroX are competitors of Badger, however, is disputed. The parties present the following facts in defense of their respective positions.

Prior to the creation of HydroX, PowerTeams' entities had provided certain hydrovac services directly to clients, while subcontracting out other services to be performed by companies such as Badger [Dkt. 63, at 3-4]. Mr. Palmer claims that HydroX was created to "insource" all of PowerTeams' current hydrovac services so that PowerTeams could "claw back" the money it was otherwise spending to engage subcontractors [*Id.*; Dkt. 68, at 9]. However, Badger asserts that HydroX's operations are more expansive than just "insourcing" existing contracts, as evidenced by its direct communication with clients and the commentary of its representatives [Dkt. 68, at 10]. Before the creation of HydroX, PowerTeam subcontracted approximately one-fifth of its hydrovac services to Badger [*Id.* at 9].

## C.  Breach of a Fiduciary Duty

Mr. Palmer's work that was performed on behalf of SEC prior to his resignation provides the basis for Badger's claim that Mr. Palmer has breached his fiduciary duty under the Agreement. During a ten-day period, from March 21, 2019 through March 31, 2019, Mr. Palmer was engaged in email communications with an SEC representative regarding branding and marketing information [Dkt. 63, at 12]. One e-mail, for example, confirms that Mr. Palmer attended a meeting with SEC individuals on March 28, 2019

[*Id.* at 12-13]. Another e-mail during this timeframe includes a list of action items for Mr. Palmer [*Id.* at 13]. Mr. Palmer continued to engage in e-mail communications with SEC representatives after announcing his resignation on April 1, 2019, but before officially departing from Badger on April 15, 2019 [*Id.*].

### D. Breach of the Agreement's Non-Solicitation Provisions

Badger also alleges breaches of both the Agreement's customer and client non-solicitation restrictions. Badger states that Mr. Palmer, while still working for Badger, recruited a Badger employee to work for SEC. Badger had given an offer to that individual, which had been verbally accepted [Dkt. 68, at 13]. Around April 1, 2019, after the individual had discussed the offer with Mr. Palmer, Mr. Palmer directed him to Mr. Campbell. SEC offered the individual a position on April 3, 2019, which he accepted [*Id.*]. At the Court hearing, Badger represented that a total of thirteen employees had left Badger to accept jobs with SEC/HydroX. Counsel for Badger noted that Mr. Palmer had been included on e-mails regarding the hiring of at least some of these employees.

Badger has adduced facts specific to Mr. Palmer's alleged solicitation of its clients, in addition to its employees. Badger is concerned primarily with the business of one client, Georgia Power, whose parent company is a long-standing client of SEC's. Since Mr. Palmer's departure from Badger to work for SEC/HydroX, Badger's business from Georgia Power has decreased [Dkt. 63, at 5-6; Dkt. 68, at 11-12]. Badger cites an e-mail sent from an SEC representative on April 17, 2019 setting out SEC's pricing list for Georgia Power as an proof of Mr. Palmer's client solicitation activities [Dkt. 68, at 12].

## Analysis

### I.      Standard of Review

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction.  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (*citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)).  However, if these threshold conditions are met, the Court must then assess the balance of the harm—the harm to Badger if the injunction is not issued against the harm to Mr. Palmer if it is issued—and determine the effect of an injunction on the public interest.  *Id.*  "The more likely it is that [the moving party] will win [its] case on the merits, the less the balance of harms need weigh in [its] favor."  *Id.*

### II.      Discussion

#### A.  Likelihood of Success on the Merits

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, [it] must only show that [its] chances to succeed on his claims are 'better than negligible.'" *Valencia v. City of Springfield, Illinois*, 83 F.3D 959, 966 (7th Cir. 2018) (*quoting Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)). This is a low threshold, and we need not be certain about the outcome of the case just yet.

*Id.* We address the reasonable likelihood of success for each of Badger's legal claims in turn below.

### 1. Breach of the Non-Compete Provision

To prevail on a claim for breach of contract, Badger must show: (1) the existence of a valid contract; (2) the Mr. Palmer's breach of the contract; and (3) damages. *Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 85 (Ind. Ct. App. 2013). Badger argues that it directly competes with SEC/HydroX and that Mr. Palmer breached the non-compete provision of the Agreement by working with these entities [Dkt. 68, at 19-20]. Mr. Palmer counters that the "in any manner" portion of the non-compete provision effectively restricts Mr. Palmer from working for a competitor in any position, no matter what that position may be, rendering the non-compete clause overbroad and unenforceable under Indiana law [Dkt. 63, at 10-11]. Mr. Palmer further states that Indiana's blue-penciling doctrine cannot save this provision. [*Id.* at 17-18]. Even if deemed enforceable, Mr. Palmer argues that SEC/HydroX does not compete with Badger [*Id.* at 7]. Badger defends the legal validity of the non-compete provision on its face, but argues if it is deemed unenforceable, it can be saved with the following blue-penciling by the Court:

> (b) within the geographical area of the State(s) of Georgia, Florida, Tennessee, North Carolina, South Carolina, Alabama, Virginia, and Mississippi compete in any manner with the Corporation, ~~or own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any business which competes directly or indirectly with the Corporation…~~"

[Dkt. 64, at 3-4]. While it is a hotly disputed matter between the parties whether SEC/HydroX is in fact Badger's competitor, we need not resolve this issue at this time, given our determination that there is not a reasonable likelihood that Badger can establish that this provision is legally enforceable, nor that its deficiencies can be remedied via blue-penciling.

As a rule, Indiana courts strongly disfavor non-compete covenants as restraints of trade in employment contracts. *Central Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728–29 (Ind. 2008) (*internal citations omitted*). Covenants not to compete are thus strictly construed against employers. To be enforceable, such covenants must be reasonable in scope as to time, activity, and geography so to protect an employer's legitimate interests. *Id.* at 729. Our analysis here hinges on whether the provision before us is reasonable in terms of the scope of activities it seeks to restrict. "[I]f a covenant is clearly separated into parts, some of which are reasonable and some of which are not, the covenant may be divided according to the blue-pencil doctrine." *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d at 779 (*internal citations omitted)*. When blue-penciling, however, the Court is not permitted to add terms, but may only strike unreasonable restraints or offensive clauses. *Id.* at 783-84.

As noted by Mr. Palmer, numerous Indiana state and federal courts, including ours, have declined to enforce non-compete provisions such as Badger's that prohibit employees from working for competitors "in any manner," deeming them overbroad. *Distributor Service, Inc. v. Stevenson*, 16 F. Supp. 3d 964 (S.D. Ind. 2014); *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772 (Ind. Ct. App. 2014); *Buffkin v. Glacier Grp*., 997

N.E.2d 1 (Ind. Ct. App. 2013); *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164 (Ind. Ct. App. 2008); *MacGill v. Reid*, 850 N.E.2d 926, 930 (Ind. Ct. App. 2006); *Sharvelle v. Magnante*, 836 N.E.2d 432 (Ind. Ct. App. 2005); *Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103 (Ind. Ct. App. 2003). Though we conclude this issue was debatable in times past, more recent Indiana cases reflect a clear trend of rejecting non-compete provisions that utilize this or comparable language. Interpreting these provisions to foreclose enforcement has been the approach of Indiana courts throughout the past decade.

In *Gleeson v. Preferred Sourcing, LLC*, the Indiana Court of Appeals recognized that Indiana judicial decisions on this topic were hard to reconcile, but stated that recent cases followed the rule, presented by *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803 (Ind. Ct. App. 2000), that provisions prohibiting an employee from working for a competitor "in any manner" were unenforceable. Meanwhile, Indiana courts have routinely rejected the rule enunciated in *Unger v. FFW Corp.*, 771 N.E.2d 1240 (Ind. Ct. App. 2002), which held the opposite. 883 N.E.2d at 175-76. Accordingly, the *Gleeson* court adopted the approach taken by the majority of courts in rejecting the party's "in any manner" provision. *Id.* (*citing MacGill v. Reid*, 850 N.E.2d at 930; *Sharvelle v. Magnante*, 836 N.E.2d at 438; *Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103 at 1114). In *Distributor Service*, our Court noted that *Unger v. FFW Corp.* appeared to be an outlier amidst the myriad of modern cases holding that such provisions are

unenforceable. 16 F.Supp.3d at 973. Badger has directed us to not a single Indiana case post-*Gleeson*, nor were we able to locate any holding otherwise.[1]

The question before us then becomes whether Badger's proposed blue-penciling, which would limit Mr. Palmer from *competing* in any manner, as opposed to *working* in any manner, saves the provision. We do not believe that it does. On the spectrum of enforceability, this revision teeters precariously close to the unenforceable "working in any manner" language and is significantly broader than language held to be enforceable by Indiana courts. The Indiana Court of Appeals said as much in *Clark's Sales and Service, Inc. v. Smith*. 4 N.E.2d at 772. There, the employer sought to restrict its employee from working in a "competitive capacity" for any entity "providing services similar or competitive to those offered" by the employer. *Id.* at 782. The court refused to enforce this provision because it prohibited the employee from providing services to a competitor beyond those analogous to the services he had actually provided to the former employer. *Id.* The provision was held to be overly broad and unreasonable, and, consequently, unenforceable.

---

[1] Badger cites two Indiana cases as support for its proposition that the provision is enforceable: *Coates v. Heat Wagons, Inc.*, 942 N.E. 2d 905, 916 (Ind. Ct. App. 2011) and *Titus v. Rheitone*, 758 N.E.2d 85, 92 (Ind. Ct. App. 2001). However, our Court in *Distributor Service* explicitly rejected a party's assertion that *Coates* and *Titus* stood for this proposition. 16 F. Supp. 3d at 973. The *Distributor Service* court concluded that *Coates* "dealt with whether the term 'Employer' in non-compete provision was overly broad, and not with whether provision was unenforceable because it restricted employee from working for new employer in any capacity." *Id.* The *Coates* court also noted that a non-compete provision is invalid if it "restrict[s] an employee from working for any competitor of a prior employer in any capacity." 924 N.E.2d at 916. The *Distributor Service* court stated that the *Titus* case involved a non-solicitation provision, not a non-competition provision, and thus was distinguishable. 16 F. Supp. 3d at 973. Additionally, *Titus* was decided before the *Gleeson* court provided its guidance.

This principle—that non-compete provisions should limit their restraints to employees' future employment involving positions or services analogous to those actually performed by the employee—is embodied in Indiana case law. *Compare Biomet 3i, LLC v. Land,* No. 116CV00125TLSSLC, 2017 WL 1483371, at *11 (N.D. Ind. Jan. 10, 2017), *report and recommendation adopted*, No. 1:16-CV-125-TLS, 2017 WL 1483469 (N.D. Ind. Feb. 27, 2017) (enforcing Agreement that did not prohibit employee "from working for a competitor in any capacity, but only from working in a directly competitive capacity analogous to the one in which she worked for [the Employer]"); *Cork Med., LLC v. Lukaszewski*, No. 1:15-CV-00765-DKL, 2015 WL 5227929, at *10 (S.D. Ind. Sept. 4, 2015) (concluding that restriction prohibiting former sales manager from working "in the same or similar capacity or function" to that in which he worked for his employer, including any sales or sales management capacity, was reasonable); *Pathfinder Commc'ns Corp. v. Macy,* 795 N.E.2d 1103, 1114 (Ind. Ct. App. 2003) (holding that a radio station could restrict its former radio program host from being employed as an on-air personality at radio stations in the same city) *with Kuntz v. EVI, LLC*, 999 N.E.2d 425, 430 (Ind. Ct. App. 2013) (rejecting non-compete covenant that effectively limited employment in "any competitive capacity") *and Gleeson*, 883 N.E. 2d at 177 (holding that non-compete provision preventing defendant from working for a competitor in a capacity beyond the services specifically provided by defendant to his former employer was overly broad).

Unlike those provisions which courts have found to be enforceable, Badger's proposed blue-penciling would not limit Mr. Palmer from acting in only those

competitive positions analogous to the ones in which he served at Badger. Even if the language were not overly broad, it would not clearly define the conduct prohibited by the contract, as required by Indiana law. *Prod. Action Int'l, Inc. v. Mero*, 277 F. Supp. 2d 919, 930–31 (S.D. Ind. 2003) (*citing Cohoon v. Financial Plans & Strategies, Inc.*, 760 N.E.2d 190, 195 (Ind. Ct. App. 2001)).

Accordingly, we hold that Badger has not established a reasonably likelihood that the non-compete provision in the Agreement will be enforceable under Indiana law. Our discussion of this issue thus ends here.

### 2. Breach of the Confidentiality Provision & Violation of the IUTSA

Though framed as separate legal claims, the same facts control Badger's breach of contract claim and its IUTSA claim. Understandably, therefore, the parties' arguments as well as Indiana's case law underlying these separate causes of action are often overlapping and intertwined. Following the lead of Indiana judges in considering these claims, we shall discuss them together.

Regarding the confidentiality provision, the parties again differ as to whether it is enforceable under Indiana law. Mr. Palmer's arguments on this point can be disposed of quickly because they are generally unsupported by Indiana law. Mr. Palmer first maintains that the provision is overly broad because it seeks to make secret that which is not secret. He next points to Indiana cases that are wholly distinguishable from the present one. For example, the rejected agreement in *Bodemer v. Swanel Beverage, Inc.* deemed "all business information and materials" as confidential. 884 F. Supp. 2d 7171, 728. This provision drastically exceeds the scope of the Badger Agreement, which

attempts only to secure information that has commercial value, that provides the company a competitive advantage, or that aids in avoiding undesired publicity.

Further, Mr. Palmer provides no support for his assertion that the confidentiality provision is unenforceable because it lacks temporal or geographic restrictions. The single case cited by Mr. Palmer does not stand for that proposition. *Coll. Life Ins. Co. of Am. v. Austin*, 466 N.E.2d 738, 744 (Ind. Ct. App. 1984). Rather, *College Life* involved a non-compete provision which is analytically independent from a confidentiality provision. We find no basis for holding that the confidentiality provision before us here is unenforceable, so we next turn to decide whether the evidence before us supports a finding of a reasonable likelihood that Mr. Palmer breached this provision of the Agreement and violated the IUTSA.

Mr. Palmer is far from being the first employee of sneaking away from his job with his employer's documents in hand, many of which materials are of economic value to the employer and properly the subject of reasonable efforts to maintain their secrecy. In such circumstances, Indiana courts have consistently found a reasonable likelihood that non-disclosure provisions were breached and the IUTSA was violated. *Toyota Indus. Equip. Mfg., Inc. v. Land*, No. 1:14-CV-1049-JMS-TAB, 2014 WL 3670133, at *1 (S.D. Ind. July 21, 2014); *Ackerman v. Kimball Int'l, Inc*., 652 N.E.2d 507 (Ind. 1995); *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 181 (Ind. Ct. App. 2007); *U.S. Land Services, Inc. v. U.S. Surveyor, Inc.*, 826 N.E. 2d 49, 59 (Ind. Ct. App. 2005); *Hydraulic Exchange and Repair v. KM*, 690 N.E.2d 782 (Ind. Ct. App. 1998).

To determine whether Mr. Palmer's actions fall in line with those defendants who have been so enjoined, we analyze whether the downloaded documents he allegedly purloined deserve protection either as confidential information, as defined by the Agreement, or trade secrets. A protectable trade secret possesses four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy. Ind. Code § 24-2-3-2 (2019). The IUTSA provides that "actual or threatened misappropriation" of trade secrets may be enjoined. Ind. Code § 24-2-3-3(a) (2019).[2] Misappropriation, in relevant part, means:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (A) used improper means to acquire knowledge of the trade secret;
> > (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

---

[2] Court are permitted to enjoin defendants from working for new employers when there is a risk of misappropriating trade secrets, even if there is not an enforceable covenant not to compete. *Toyota Indus. Equip. Mfg., Inc. v. Land*, 2014 WL 3670133, at *8 (*citing Ackerman v. Kimball Int'l, Inc*., 652 N.E.2d at 19. *See also U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.,* 826 N.E.2d at 49 (enjoining defendant because of risk of trade secret misappropriation even though non-compete agreement was unenforceable). The risk of misappropriation also exists regardless of whether the individual's new employer is an already existing direct competitor of his former employer. *See U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*, 826 N.E. at 59 ("[The former employer] did not intend its client, prospect or surveyor databases, each having substantial value to [the employer], to be available or portable so that employees separating from the company might strip down or take whatever information they might desire to take with them, for the benefit of a new employer, or in starting or assisting a cohort or confidant in immediately establishing an aggressive, substantial competitor to [the former employer]); *see also Hydraulic Exchange and Repair v. KM,* 690 N.E.2d at 782 (finding risk of misappropriation without determining whether defendant's new employer was a competitor of the former employer").

(i) derived from or through a person who had utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .

Ind. Code § 24-2-3-2 (2019).

Badger has provided a full list of the 5000 of its documents found in Mr. Palmer's possession; has discussed the general economic value of these documents and supplemented this discussion with additional detail at the evidentiary hearing; and has outlined the various business practices it employs to keep the documents secret. It has also provided the following summary of the documents Mr. Palmer swiped:

- budgets; contract pricing and bid information for specific customers; compensation planning information; financial reports and statements; employee contact information; customer contact information; and employee salary information
- emergency response plans; strategic plans; and business development planning materials and goals
- master-servant agreements and compiled lists of master-servant agreements equipment drawings; organizational charts; job descriptions; and employee training materials

[Dkt. 64, at 9]. Indiana courts have generally held that several of the identified categories of documentation qualify as either confidential information or trade secrets when they are subject to reasonable efforts, such as those employed by Badger, to maintain their secrecy or keep them from becoming ascertainable to the general public. *Toyota Indus. Equipment Mfg., Inc. v. Land*, 2014 WL 3670133, at * 3 (characterizing customer information, financial data documents, executive reports, organizational charts, pricing strategies, and product specifications as confidential information and trade

secrets); *AL-KO Axis, Inc. v. Revelino*, No. 3:13-CV-1002 JD, 2013 WL 12309288, at

*15 (N.D. Ind. Oct. 24, 2013) (recognizing cost structures and budgets, product

development details and strategies, financial strategies, and marketing strategies as trade

secrets); N.D. Ind. Oct. 25, 2013); *U.S. Land Services, Inc. U.S. Surveyor, Inc.*, 826.

N.E.2d at 60 (qualifying customers lists and databases as trade secrets when they

contained substantial information about customers and prospective clients); *Star Sci., Inc.*

*v. Carter*, 204 F.R.D. 410, 414 (S.D. Ind. 2001) (concluding that customer lists and

pricing information are protectable trade secrets) (*citing Ackerman,* 634 N.E.2d at 783).

     Mr. Palmer does not dispute either the accuracy of Badger's list or the

reasonableness of Badger's efforts to maintain the secrecy of these documents and limit

their accessibility to the public,[3] nor does he dispute that Indiana law consistently

recognizes these types of documents as confidential information or trade secrets.[4] Rather,

he criticizes Badger for not explaining how each of the individual 5000 documents

qualifies as a trade secret or confidential information. We are unpersuaded by this

criticism. Indiana courts have not placed such a burden of proof on plaintiffs, particularly

---

[3] Mr. Palmer does argue that the documents have not been maintained as secret documents
because part of one document is available for public viewing on Badger's website [Dkt. 63, at
20]. At the court hearing, counsel for Mr. Palmer conceded that only a portion of the document is
publicly available, with the remaining portion secured. Mr. Palmer did not dispute the secrecy of
the other documents and conceded in his deposition that at least some of the documents,
particularly the strategic planning materials, are not available to the public. [Dkt. 59-3, Exh.
105].

[4] Mr. Palmer maintains accurately that costs, pricing, and marketing are "the weakest kinds of
trade secrets." *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 685 (S.D. Ind. 1998)
[Dkt. 63, at 16]. However, he does not address the plethora of other documents that are
consistently recognized as trade secrets, including strategic planning materials, customer
specifications, and equipment drawings.

at this stage of a litigation when they are tasked with expeditiously evaluating thousands of documents that an employee indisputably wrongfully took. *See Toyota Indus. Equipment Mfg., Inc. v. Land*, 2014 WL 3670133, at *3-6.

We are further unpersuaded by Mr. Palmer's criticisms because he never disputes that at least *some* of the documents qualify as confidential information or trade secrets. If the documents were without any value, it is a mystery why Mr. Palmer was moved to steal them on his way out the door en route to his new position with SEC and why he subsequently provided evasive and obfuscating answers in his response to Badger in a transparent attempt to keep Badger from uncovering the nature and extent of his theft. We thus are satisfied that Badger has shown a reasonable likelihood of proving that at least some of the documents taken by Mr. Palmer qualify as trade secrets or confidential information.

Similarly, we hold that Badger is reasonably likely to succeed on the merits of its breach of contract and IUTSA claims. As many courts before us have concluded in reviewing such cases, an employee who illicitly takes and retains his employer's proprietary information creates a risk of disclosure and misappropriation that warrants a finding that the movant has a reasonable likelihood of success on the merits of these legal claims. *Toyota Indus. Equip. Mfg., Inc. v. Land*, 2014 WL 3670133, at *1; *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d at 507; *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d at 181; *U.S. Land Services, Inc. v. U.S. Surveyor, Inc.*, 826 N.E. 2d at 59; *Hydraulic Exchange and Repair v. KM*, 690 N.E.2d at 782.

We cannot accept Mr. Palmer's belated assertion that his relinquishment of the hard drive eliminates any risk of misuse or misappropriation of the documents. Mr. Palmer's persistent refusal to disclose, first, that he had actually taken the documents and, thereafter, to explain or confirm whether he saved them anywhere else or given them to a third party leaves us wary. His feigned naivety and cavalier assertion that no continuous risk of misappropriation exists is unconvincing. If true that his dead of night downloading of these documents had "slipped his mind," surely he would have been reminded of his actions when at the time of his resignation his supervisor reiterated his obligations under the Agreement, or when Badger brought this lawsuit, or when he was asked pointedly in discovery interrogatories whether he had any access to Badger documents. Mr. Palmer's apparent disingenuousness has not helped his cause in trying to convince us that he no longer retains any access to the documents. His repeated lack of candor has created a level of distrust that neither the Court nor Badger can wish away or ignore.

We also reject Mr. Palmer's argument that evidence of use is a prerequisite for an order to enjoin his continued possession of these documents. Mr. Palmer has directed us to cases involving decisions not to enjoin defendants who did not use the documents *and* did not steal any documents from their former employers. *Logansport Mach. Co. v. Neidlein-Spannzeuge GmbH*, No. 3:12-CV-233 JD, 2012 WL 1877854, at *9 (N.D. Ind. May 22, 2012); *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 820 (S.D. Ind. 2007); [Dkt. 63, at 22]. He has ignored other cases where defendants' bad behavior created a reasonable likelihood of plaintiffs' success on the merits of their claims, even in the absence of evidence of actual use. Mr. Palmer's attempt to minimize his possession of

the Emergency Response Plan document and disclaiming any use of it by him or others further undermines his argument. The confidentiality provision in the Agreement prohibited Mr. Palmer from leaving Badger with any of Badger's documents, which restriction he indisputably violated. The Agreement covers both the disclosure and the use of confidential information. From the evidence before us, we know, at a minimum, that Mr. Palmer disclosed at least one of Badger's documents, to wit, the Emergency Response Plan, to his new employer.

Badger has thus successfully established a reasonably likelihood of prevailing on the merits of its legal claims respecting the confidentiality provision and the IUTSA claim.

### 3. *Remaining Legal Claims*

Badger has not adduced any facts to warrant a preliminary injunction based on Mr. Palmer's alleged breach of a fiduciary duty or the issuance of the non-solicitation provisions. Therefore, we address these claims only briefly, following the lead of the parties.

Badger has not established at this early point in the litigation a reasonable likelihood of success on the merits of either the customer non-solicitation provision or the client non-solicitation provision. To date, Badger has presented no direct evidence linking Mr. Palmer to any specific employees who left Badger to join SEC/HydroX. The one individual mentioned in Badger's briefing was never an employee, contractor, subcontractor, or consultant of Badger, merely a prospective employee. Even if the non-solicitation provision were enforceable and even if Mr. Palmer solicited the individual to

work for SEC, Badger has provided no explanation as to how the solicitation of an individual who never worked for Badger would constitute a breach of this provision. At the hearing, Badger's counsel asserted that thirteen additional Badger employees had left for SEC/HydroX. However, beyond that assertion, Badger failed to provide any evidentiary link between those employees and any solicitations from or by Mr. Palmer. In addition, Badger's concerns at this point remain speculative with regard to any future attempts by Mr. Palmer to solicit Georgia Power.

Badger asserts that employees owe fiduciary duties to employers, and that Mr. Palmer breached this duty by beginning to work for SEC/HydroX while still employed with Badger. Even if we were to hold that Mr. Palmer had a fiduciary duty to Badger, Badger has not explained how the overlap in employment constitutes a breach of that duty, nor has it articulated any harm, let alone irreparable harm, for which there is no adequate remedy at law, that resulted from this alleged breach.

### III.     Irreparable Harm & Inadequate Remedy at Law

Our remaining discussion relates only to Badger's legal claims concerning which we have determined that a reasonable likelihood of success on the merits exists, to wit, breach of the Agreement's confidentiality provision and violation of the IUTSA.

As other courts have also found, Mr. Palmer's "pre-departure harvesting" of Badger's proprietary information compounds the threat of misuse and misappropriation that could likely result in irreparable harm to Badger for which there is no remedy at law. *Toyota*, 2013 WL 3670133, at *8 (*quoting Ackerman*, 652, N.E.2d at 510-11). Specifically, there is an ongoing threat of potential or actual misappropriation, given that

we cannot definitively conclude that Mr. Palmer no longer possesses or has access to Badger's confidential information or trade secrets. If those documents were utilized and/or distributed by Mr. Palmer, Badger would likely experience irreparable harm in the form of Mr. Palmer or his new employer receiving an unfair competitive advantage, and this is true without regard to whether SEC/HydroX is currently Badger's direct competitor. *See Hydraulic Exchange and Repair v. KM,* 690 N.E.2d at 782.

Badger has satisfied the first three requirements entitling it to a preliminary injunction. Whether any irreparable harm would flow to Mr. Palmer should an injunction enter requires us to balance the parties' respective harms against the other. Until we can be more confident than we are now, upon a proper evidentiary showing, that Mr. Palmer no longer possesses or has access to Badger's confidential information and trade secrets, the harm Badger faces due to an actual or threatened misappropriation of these materials greatly outweighs any harm Mr. Palmer may suffer in not being able to work for SEC/HydroX during this period of uncertainty. As in *Toyota,* any harm Mr. Palmer faces is not irreparable since he "holds the keys to his release." 2013 WL 3670133, at *7. If Mr. Palmer was moved to provide adequate evidentiary assurances that he no longer possesses, nor can he gain access to, Badger's documents, we would lift this portion of the injunction. Further, there is no risk that the public will be harmed by this injunction because Mr. Palmer does not have a right to use, possess, or disclose Badger's confidential information or trade secrets. *Id.* at *8.

Badger's concerns as pressed here do not include Mr. Palmer's destruction, alteration, or other disposition of potentially relevant evidence, and no other reason exists

to our knowledge warranting an order enjoining Mr. Palmer from "destroying, altering, removing, modifying, deleting, or disposing of any documents." Accordingly, the injunction addresses only our concerns surrounding Mr. Palmer's potential use and misappropriation of Badger's confidential information and trade secrets.

We say again: Mr. Palmer's reticence in taking responsibility for his wrongful taking of Badger's business documents has complicated the Court's and the parties' ability to resolve these issues without injunctive relief. If and when the subject documents are no longer in Mr. Palmer's possession or accessible to him by other means, and he can provide a sworn affidavit to that effect, this portion of the injunction will be lifted.

## **CONCLUSION**

For the reasons detailed above, Plaintiff Badger Daylighting Corporation's Motion for Preliminary Injunction is <u>GRANTED in part and DENIED in part.</u> Defendant Gary Palmer, his agents and all persons in active concert or participation with him who receive actual notice of this order, are hereby <u>PRELIMINARILY ENJOINED</u> until further order of this Court from possessing, using, or disclosing to others Badger's confidential information or trade secrets. Mr. Palmer is further enjoined from working at SEC or HydroX until he provides evidence in a proper verifiable form that he has either surrendered to Badger all the Badger documents he wrongfully took or that he no longer has access to or possession of Badger's confidential information and trade secrets and

that no third party to whom he may have distributed these materials continues to retain them in derogation of his requests that they be returned to Badger.

IT IS SO ORDERED.

Date: ___9/20/2019___

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Adam Arceneaux
ICE MILLER LLP (Indianapolis)
adam.arceneaux@icemiller.com

Gordon M. Berger
FISHERBROYLES, LLP
gordon.berger@fisherbroyles.com

Barry Goheen
FISHERBROYLES, LLP
barry.goheen@fisherbroyles.com

Jamila S. Mensah
NORTON ROSE FULBRIGHT US LLP
jamila.mensah@nortonrosefulbright.com

Hannesson Ignatius Murphy
BARNES & THORNBURG, LLP (Indianapolis)
hmurphy@btlaw.com

Alexandria Hanauer Pittman
ICE MILLER LLP (Indianapolis)
alex.pittman@icemiller.com

Carolyn Webb
NORTON ROSE FULBRIGHT US LLP
carolyn.webb@nortonrosefulbright.com